IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Andrew Johnsen,<br><br>    Plaintiff,<br><br>vs.<br><br>Sean R. Kirtz, and<br>ICO Services, Inc.,<br><br>    Defendants. | Civil Action No. _____<br><br><br>JURY DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Andrew Johnsen ("Johnsen" or "Plaintiff") files this, his Original Complaint against Defendants Sean R. Kirtz ("Kirtz" or "Defendant Kirtz"), and ICO Services, Inc., ("Defendant ICO Services") (the latter two taken together the "Defendants"), and respectfully states follows:

### I.

#### Preliminary Statement

This case arises out of a new twist on an old scam, the "Initial Coin Offering" or "ICO." That ICO sounds like IPO, or "Initial Public Offering," is hardly a mistake. Because until recently ICOs received less scrutiny than IPOs, unscrupulous persons were able to defraud investors with unchecked hucksterism. Of course, not all ICO's are rife with fraud; but this case involves fraudulent offers and sales of securities by Defendant Kirtz and the use of his wholly owned marketing scam, Defendant ICO Services.

In the fall of 2017, Kirtz orchestrated the sale of CLOUT, a virtual "crypto-currency." CLOUT, like the other crypto-currencies, would be decentralized, with no single administrator,

central authority, or repository. Part of CLOUT's novelty lay in the alleged control of the token's releases. Unlike many ICOs, CLOUT's tokens would be released more slowly (to maintain value of the currency), and CLOUT would also issue "daughter" tokens, *i.e.*, tokens to be paid to already existing CLOUT holders for, *inter alia*, their participation in marketing CLOUT. These daughter tokens were called "CLC." Defendant Kirtz had a legion of ideas that he pushed — a multi-media marketing arm, supporting other crypto-currencies, etc., but, before any of that could happen, Defendant Kirtz had to conduct "pre-ICO" sales of CLOUT to investors like Plaintiff. The price for the Pre-ICO was $1.00 per CLOUT.

Of course, after the Pre-ICO sales, there was a real ICO where the currency ultimately tanked into virtual worthlessness. As of July 18, 2018, and according to hitbtc.com, CLOUT had a value of $0.00314. That's three tenths of a cent. This lawsuit may not put any of the promise back into CLOUT, but it will bring a fraudster to justice along with those entities which have enabled and/or benefited from his misconduct.

## II.

### PARTIES

1. Plaintiff Andrew Johnsen is a resident of the State of Texas. He is suing on behalf of himself and certain assignors, all of whom, like Johnsen purchased CLOUT on a pre-ICO basis from Defendant Kirtz.

2. Defendant Sean R. Kirtz is a resident of the State of Florida. He may be served with process at his residence, 7355 Mahogany Bend Court, Boca Raton, FL 33434-5120 or wherever he may be found.

3. Defendant ICO Services, Inc., is a Florida corporation, owned in whole or in part by Defendant Kirtz. It may be served with process through its registered agent, Sean R. Kirtz, at

his residence, 7355 Mahogany Bend Court, Boca Raton, FL 33434-5120 or wherever he may be found.

## III.

### JURISDICTION & VENUE

4. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1331.

5. This Court also enjoys supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

6. In the absence federal question jurisdiction, this Court would enjoy diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000.00.

7. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) & (2).

## IV.

### FACTS APPLICABLE TO ALL COUNTS

**A.   Kirtz and CLOUT**

8. Starting in the late summer of 2017, Kirtz started soliciting potential investors including Plaintiff, Jesse Wilkinson, and Xueqing Huang for his new crypto-currency CLOUT. Kirtz, at all times, has claimed senior positions within CLOUT, including "Founder," or as the CLOUT heralded:

> CLOUT was founded by Sean Kirtz, Dean James Langas, Frank Lucido and Simon Josef. Before we built a platform that will change the world, we built a team that has already proven their ability to do so.

9. Kirtz has never changed the world, lacks the ability to do so, nor is it likely that he ever will.

10. During the Pre-ICO time frame, Kirtz held himself out as experienced in crypto-currencies.

11. As a part of that solicitation Kirtz generated a "whitepaper" for CLOUT. A whitepaper in this instance was a written document that purported to explain why the new crypto-currency is novel, unique or needed. CLOUT claimed all three. Although now removed from any CLOUT website featuring CLOUT information, the CLOUT whitepaper is a mix of marketing lingo and techno-speak.

12. Unlike many forms requiring disclosure (*i.e.*, a prospectus or regulatory filing), no such rules govern ICO whitepapers. For example, the whitepaper lists a "team," but their involvement was non-descript if not non-existent.

13. Registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. Absent registration, issuers of securities are able to tout their investment opportunities with no limitations whatsoever. For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines), or peddle its securities using unbounded exaggerations regarding the progress of its products, business plan, business strategies, etc.

14. Kirtz is not registered with the SEC; CLOUT was not registered with the SEC; neither Kirtz nor CLOUT were registered with the Texas Securities Board.

15. At its most basic, and according to its whitepaper, Kirtz represented CLOUT's team as:

> Although team CLOUT has a clear plan to ensure that the value of the CLOUT token can be upheld, the main value propositions come not from the value of the token itself, but rather from the revenue streams that are open to plat-form contributors.

In other words, CLOUT would retain its value, but if one bought it and participated in CLOUT marketing, one could also receive additional daughter tokens in the form of CLC's.

16. Although Plaintiff received CLC's, they are worthless as there is no market for them.

17. As another part of the marketing pitch, Kirtz informed potential buyers that, *inter alia*, CLOUT's limited token supply was allocated as follows:

> CLOUT's 100 million token supply is allocated as so:
>
> 1. 2.5 million tokens distributed to project early adopters during pre-ICO sale
>
> 2. 10 million tokens (10%) will be distributed to project supporters during the token sale.
>
> 3. 30 million tokens (30%) will be used to motivate developers and pay bounties used to develop the CLOUT Platform.
>
> 4. 25 million tokens (25%) will be allocated to the CLOUT Fund and will be used to invest in other blockchain projects over time, including ICOs and/or cryptocurrencies. These investment decisions will be based on the highest rated opportunities by the "up-voting" of the CLOUT platform members.
>
> 5. 22.5 million tokens (22.5%) will be used to motivate the CLOUT developers and executives overtime.
>
> 6. 5 million tokens (5%) will be retained by the founders (To be released during a 20-month period)
>
> 7. 5 million tokens (5%) to be released every 1 year over the next 5 years, based on certain milestones in the CLOUT roadmap being achieved.

With the possible exception of the Pre-ICO sales, none of these statements were true.

18. The pricing proposed was also fictional:

> ICO
> •5 million tokens (5%) will be distributed during Phase 1 ICO at $2.50/ CLOUT
> •3 million tokens (3%) will be distributed during Phase 2 ICO at $5/ CLOUT
> •2 million tokens (2%) will be distributed during Phase 3 ICO at $10/ CLOUT

Nothing like this happened at all.

19. The whitepaper falsely claimed that the funds raised would be used:



20.     Instead, according to Kirtz's own March 26, 2018 media statements:

"We launched a pre-ICO, and it was amazing until my partner backed out," he [Kirtz] says, on raising $2.5 Million for the Clout token which was worth $1. Like many early crypto enthusiasts turned fund managers and consultants, Kirtz encountered legal issues. "The co-founder tried to blackmail me for funds, reporting the company was a scam." Kirtz's team shrunk to three employees (he started with twenty), with mainly legal staying on board. Determined to save the team, Kirtz made a strategic partnership with a separate company he founded called ICO Services Inc. As the consulting arm for CLOUT, Kirtz pulls ICO clients and uses 25% of the profits to airdrop to token holders, and another 25% to cover operational costs."

Said differently, instead of following his promises in the whitepaper, Kirtz funneled the Pre-ICO funds raise to his own company — not for CLOUT — for his own benefit.

21.     The whitepaper even advanced the idea that investors would be screened based upon the size of their purchases or where they resided:

> Pre Sale and ICO will have a registration process where identity documentation is collected, verified and married to the wallet address, phone number and email provided. 2FA will be required to authenticate phone numbers. Identity documents must verify residential address and email must be confirmed. *Individuals from areas of "high-risk" or participation amounts greater than $13,160USD need to provide additional data (source of wealth, funds etc).

22.     This, too, promoted an illusion of security (as reflected in other parts of the whitepaper), false rigorous internal processes, and alleged diligence on Defendants' part. It, too, was fantasy.

23. Depending on where one reads in the whitepaper, CLOUT is a Gibraltar incorporated and registered company named either "CLOUT Technology, Ltd." or "CLOUT Technologies, Ltd." Upon information and belief, no such company is incorporated and registered in Gibraltar. Moreover, no company by either name has registered to do business in Florida, with the SEC, or with the Texas Securities Board. One website, https://www.icotokennews.com/icos/clout/, even goes so far as to state that "CLOUT Technologies" is incorporated and registered in Nevis. Upon information and belief, no such company is incorporated and registered in Nevis.

### B. Pre-ICO Sales

24. Plaintiff purchased $50,000.00 of CLOUT by (i) buying another crypto-currency, Ethereum ("ETH"), then (ii) using the ETH to purchase CLOUT. Wilkinson purchased $300,000.00, and Huang purchased $55,000.00.[1] The sales was consummated by transferring the ETH to Kirtz's designated "wallet"[2] on the Ethereum Network.

25. Between approximately September 30, 2017 and October 26, 2017, Defendants ran the "official" Pre-ICO for CLOUT during which time they allegedly raised approximately $2.0 MM. The price for CLOUT to the Pre-ICO investor was $1.00 per CLOUT token. Defendant Kirtz made additional sales after the Pre-ICO at Pre-ICO prices.

26. Plaintiff never provided any identity documentation to CLOUT — nay was not asked for any — other than making sure he had enough ETH to close the purchase. He has never heard of any other investor providing any identify documentation either.

---

[1] Both Wilkinson and Huang have assigned their claims to Plaintiff.

[2] Here, a "wallet" is a secure digital wallet used to store, send and/or receive digital currency. Most crypto-currencies have an official wallet or a few officially recommended third-party wallets. In order to use any cryptocurrency, one must have some form of cryptocurrency wallet.

27. The Pre-ICO sale comprised an investment contract, a form of security. Specifically, the Pre-ICO buyers, like Plaintiff, purchased the CLOUT tokens at $1.00 each with the expectation that they would later be worth substantially more money.

### C. The Listing is a Disaster.

28. The "real" ICO started on November 17, 2017 and ended on December 17, 2017. Per Kirtz's whitepaper, the price for CLOUT during the first phase of the ICO was to be $2.50 per CLOUT token. There are conflicting reports as to the actual amount raised, the amounts of CLOUT sold, and the prices realized, but some reports indicate that the amount raised may have been as high as $2.6 MM. It is likely far less.

29. Another major blunder of the CLOUT team was its handling of the security's listing procedures. Investors were promised that the security would list in a timely manner and for a target value price of $2.50, the ICO price. The CLOUT listing on HITBTC was over 5 days late and resulted in poor investor sentiment within the market place. Likely due to a complete lack of marketing, the token listed with very few buy orders in comparison to the overwhelming sell activity. All buy orders were substantially lower than the targeted market price and without volume the security was moribund, at best, on arrival.

### D. CLOUT Today

30. Today, CLOUT is a dead crypto-currency. Barely traded, if at all, it has no value and less future. In the meantime, however, its "Founder" is bragging of managing "5-6 projects at a time, and is scheduled to raise $260 million between ICOs. With focus on creative smart contracts, community engagement and marketing, the activity will only increase predicts Kirtz."

31. In normal times, regulators would be all over Defendants. They may still get to him. Thankfully, in the meantime, the law imbues private individuals with the rights to seek recompense and sue in the stead of the regulator to see that injustice is stopped.

V.

CAUSES OF ACTION

**Count One:   SECURITIES FRAUD — CLOUT IS A SECURITY (10B-5).**

32. Plaintiff incorporates the provisions of the above paragraphs and would show the Court that he is entitled to recover from the Defendants based on their conduct and omissions.

33. Defendants' use of Defendant Kirtz's wallet comprised an exchange as defined by 15 U.S.C. § 78c(a)(1).

34. Defendant Kirtz is an issuer as defined by 15 U.S.C. § 78(c)(8).

35. Each of the Defendants is a person as defined by 15 U.S.C. § 78c(9).

36. CLOUT is a security as defined by 15 U.S.C. § 78c(10) because the sales comprised investment contracts. The CLOUT Pre-ICO sales and sale of CLOUT tokens was the sale of unregistered securities under controlling federal law. CLOUT tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any CLOUT tokens, an investment of money denominated in US dollars, in the form of ETH was required; (b) the investment of money was made into the common enterprise that is CLOUT and the potential further CLOUT product lines, including but not limited to daughter tokens, CLC; (c) the success of the investment and any potential returns on such was entirely reliant on Defendants' ability to create the promised crypto-currency product line.

37. Plaintiff reasonably relied upon Defendants' statements about CLOUT and its pricing when they purchased CLOUT on a Pre-ICO basis.

38. As such, Defendants have participated in a sale of unregistered securities in violation of the Securities Act, and are liable to Plaintiff for rescission and/or compensatory damages.

39. In offering and selling the above-described securities to Plaintiff and his assignors, Defendants made use of the means and instrumentalities of interstate commerce, including but not limited to, the telephone and the internet. As detailed herein, the CLOUT Pre-ICO sales were, and have been at all times, been an offer and sale of unregistered securities.

40. Between approximately September 30, 2017 and approximately October 26, 2017 and continuing until January 2018, in connection with the sale of CLOUT on a "Pre-ICO" basis, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities. Defendant Kirtz sold CLOUT after the Pre-ICO on a Pre-ICO price basis. As described above, Defendants' conduct is manipulative and deceptive within the meaning of 15 U.S.C. § 78j(b).

41. Plaintiff and his assignors have been damaged through their purchases of CLOUT.

**Count Two:   SECURITIES FRAUD – UNREGISTERED SECURITY / CONTROL PERSON.**

42. Plaintiff incorporates the provisions of the above paragraphs and would show the Court that he is entitled to recover from the Defendants based on their conduct and omissions.

43. CLOUT is a security as defined by 15 U.S.C. § 77a(1). CLOUT is a security as defined by 15 U.S.C. § 78c(10) because the sales comprised investment contracts. The terms of the CLOUT Pre-ICO called for an investment of crypto-currency by Plaintiff and his assignees. The CLOUT Pre-ICO sales and sale of CLOUT tokens was the sale of unregistered

securities under controlling federal law. CLOUT tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any CLOUT tokens, an investment of money denominated in US dollars, in the form of ETH was required; (b) the investment of money was made into the common enterprise that is CLOUT and the potential further CLOUT product lines, including but not limited to daughter tokens, CLC; (c) the success of the investment and any potential returns on such was entirely reliant on Defendants' ability to create the promised crypto-currency product line.

44. Each of the Defendants is a person as defined by 15 U.S.C. § 77a(2).

45. Defendant Kirtz is an issuer as defined by 15 U.S.C. § 77b(a)(4).

46. Defendants are prohibited from selling unregistered securities within the meaning of 15 U.S.C. § 77e because they or their agents solicited Plaintiff and his assignees in the CLOUT Pre-ICO.

47. The funds paid by Plaintiff and his assignees were to be used by Defendants in an effort by Defendants to secure a profit for themselves and the investors. As a result, the investors, including Plaintiff and his assignees, shared in the risks and benefits of the investment.

48. Plaintiff and his assignees relied on, and are dependent upon, the expertise and efforts of Defendants for their investment returns.

49. Plaintiff and his assignees expected that they would receive profits from their investments in Defendants' efforts with respect to CLOUT.

50. CLOUT tokens constitute investment contracts and are therefore subject to federal securities laws, including the registration requirements promulgated thereunder.

51. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

52. By reason of the foregoing, Defendants have violated 15 U.S.C. §§ 77e(a) and 77e(c).

53. As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and his assignees have suffered damages in connection with their respective purchases of CLOUT securities in the CLOUT Pre-ICO.

54. Kirtz is subject to joint and several liability by virtue of his position within the CLOUT organization at the time of the Pre-ICO. ICO Services, a partner and promoter of CLOUT, is subject to joint and several liability by virtue of its position within the CLOUT organization.

55. Defendants knew, recklessly disregarded or should have known of the misrepresentations made through the CLOUT organization in connection with the Pre-ICO.

56. Defendants have additional liability under 15 U.S.C. § 77l(a).

57. Defendant Kirtz has additional liability under 15 U.S.C. § 77(o)(a) as a control person.

58. Defendant ICO Services has additional liability under 15 U.S.C. § 77(o)(a) as an aider and abettor.

59. Plaintiff seeks all possible relief under the Securities Act.

**Count Three:**     **TEXAS SECURITIES ACT**

60. Plaintiff incorporates the provisions of the above paragraphs and would show the Court that he is entitled to recover from the Defendants based on their conduct and omissions.

61. The purchases of CLOUT made by Plaintiff are purchases of securities under TEX. CIV. CODE Ann. § 581-4(A).

62. Defendants sold securities to residents of the State of Texas and other states, and are therefore subject to the Texas Securities Act, TEX. CIV. CODE Ann. § 581, *et seq.*

63. Defendants and/or their agents violated § 581-33(A)(2) of the Texas Securities Act in that they offered and sold a security by means of untrue statements of material fact and/or by the omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and Plaintiff was damaged thereby.

64. Additionally, and in the alternative, Defendants violated §581-33(F)(2) of the Texas Securities Act in that they materially aided the sellers of the securities at issue with an intent to deceive or defraud or with reckless disregard for the truth or the law when offering and describing the securities at issue to Plaintiff. Defendants rendered assistance in the face of a perceived risk that his or its assistance would facilitate untruthful or unlawful activity by the primary violator(s) and each possessed a general awareness that his role was part of an overall activity that was improper.

65. Additionally, and in the alternative, Defendants, by virtue of their position and relationships, were control persons of the CLOUT securities, within the meaning of § 581-33(F)(1) of the Texas Securities Act as they had the power and influence to control the acts of others and exercised the same power and influence. As a consequence, Defendants are jointly and severally liable for any violations of § 581-33(A)(2) of any other party associated with CLOUT.

66. As a result of these violations, and pursuant to § 581-33(D)(1) of the Texas Securities Act, Plaintiff is entitled to have the above described transactions rescinded, and, upon tender of the securities, to recover from the Defendants: (a) the consideration paid for the securities plus interest thereon at the legal rate from the date of purchase by the Plaintiff; (b) plus costs and attorney's fees; (c) less the amount of any income Plaintiff received from the securities prior to their tender.

### Count Four: FLA. FRAUDULENT TRANSFER

67. Plaintiff incorporates the provisions of the above paragraphs and would show the Court that he is entitled to recover from the Defendants based on their conduct and omissions.

68. At all relevant times, Plaintiff has held claims against Kirtz.

69. For purposes of this Count, Kirtz is the "Transferor Defendant."

70. For purposes of this Count, ICO Services, Inc. is the "Transferee Defendant."

71. Pursuant to FLA. STAT. Ann. § 726.102(14), "'[t]ransfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Kirtz transferred cash and other benefits to the Transferee Defendant.

72. Pursuant to FLA. STAT. Ann. § 726.105, the transfer of Kitrz's cash and other benefits to the Transferee Defendant were transfers made with actual intent to hinder, delay, or defraud, *inter alia*, Plaintiff.

73. The Transferee Defendant is not and was not good faith transferee(s) who took for value. The Transferee Defendant did not provide reasonable equivalent value.

74. Pursuant to FLA. STAT. Ann. § 726.105, Plaintiff seeks to set aside the transfer(s) to the Transferee Defendant.

75. Pursuant to FLA. STAT. Ann. § 726.105, Counter-Plaintiff and Third-Party Plaintiff seeks an order granting execution, levy or other relief against the Transferee Defendant.

76. Pursuant to FLA. STAT. Ann. § 726.105, Counter-Plaintiff and Third-Party Plaintiff seeks a judgment against the Transferee Defendant for the amount of the transfers.

## VI.

### REQUEST FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff makes his demand for trial by jury on all issues so triable.

## VII.

### PRAYER

Plaintiff request that the Court award it the following relief against the Defendants above as may be appropriate:

(1) A Judgment awarding actual, compensatory, damages in the amount of not less $405,000.00;

(2) A Judgment awarding uncapped exemplary and punitive damages;

(3) All costs of court and attorneys' fees;

(4) Pre- and post-judgment interest at the highest legal rate allowed by law from the earliest time allowed by law; and

(5) All other relief to which Plaintiff is justly entitled.

        Respectfully submitted,

*/s/ Tony Andre*

Tony Andre
Fla. Bar No. 40587
**ANDRE LAW FIRM P.A.**
18851 N.E. 29th Ave., Suite 724
Aventura, FL 33180
Telephone:	(786) 708-0813
Telecopier:	(786) 513-8408
andre@andrelaw.com

**ATTORNEYS FOR PLAINTIFF**

**Of Counsel:**

Charles W. Gameros, Jr., P.C.
State Bar No. 00796596
**HOGE & GAMEROS, L.L.P.**
6116 North Central Expressway, Ste. 1400
Dallas, Texas   75206
Telephone:	(214) 765-6002
Telecopier:	(214) 559-4905

&

David Reese Clouston
State Bar No. 00787253
**SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.C.**
900 Jackson Street, Suite 440
Dallas, Texas   75202
Telephone:	(214) 741-3005
Telecopier:	(214) 741-3055